VICE CHANCELLOR

**COURT OF CHANCERY
OF THE
STATE OF DELAWARE**

COURT OF CHANCERY COURTHOUSE
34 THE CIRCLE
GEORGETOWN, DELAWARE 19947

Date Submitted: August 29, 2014
Date Decided: September 15, 2014

Catherine G. Dearlove
Brock E. Czeschin
Robert L. Burns
Elizabeth A. DeFelice
Richards, Layton & Finger, P.A.
One Rodney Square
920 North King Street
Wilmington, Delaware 19801

Robert A. Penza
Christopher M. Coggins
Polsinelli PC
222 Delaware Avenue, Suite 1101
Wilmington, Delaware 19801

Michael M. Purpura
William M. Harstad
Carlsmith Ball LLP
ASB Tower 1001 Bishop Street
Suite 2100
Honolulu, Hawaii 96813

> Re: *Kahuku Holdings, LLC and First Wind Kahuku Holdings, LLC
> v. MNA Kahuku, LLC*, Civil Action No. 9991-VCG

Dear Counsel:

This matter involves the arbitrability of a dispute between the two members

of a Delaware LLC created to hold a single asset: a subsidiary operating a wind

farm on the island of Maui in Hawaii. The defendant here filed an arbitration

proceeding in Hawaii, consistent with its understanding of the operative LLC

agreement. The plaintiff filed this action, seeking to enjoin the arbitration. The

defendant then filed a mirror-image action in Hawaii, seeking to compel

arbitration. The arbitration itself is effectively stayed, awaiting a decision from this Court or the Hawaii court on arbitrability. Because I find that the parties agreed in the LLC agreement to have questions of arbitrability decided before a court in Hawaii, this action must be stayed or dismissed in favor of the pending Hawaii action.

I. *Background*

The parties' dispute before this Court arises from a joint venture to operate a wind generation project in Kahuku, Hawaii (the "Wind Farm").[1] In 2010, non-party entities First Wind Holdings, LLC ("FW Holdings") and Makani Nui Associates, LLC ("Makani") entered into a limited liability agreement (the "Original LLC Agreement") to govern Plaintiff Kahuku Holdings, LLC ("Kahuku Holdings"), a Delaware entity that had been formed by FW Holdings the previous month.[2] Under the Original LLC Agreement, FW Holdings owned 92% of the ownership interest of Kahuku Holdings and was its sole manager, while Makani owned the remaining 8% ownership interest and held no voting rights. In turn, Kahuku Holdings' sole asset was and still is its 100% ownership interest in non-

---

[1] Unless otherwise indicated, the background facts were taken from the Plaintiffs' Verified Complaint and subsequent briefing. The origin story of Kahuku Holdings, however, is not entirely developed in the documents submitted by the Plaintiffs; as a result, I have found it helpful to take some non-dispositive facts from the Opening Brief in Support of Defendant MNA Kahuku, LLC's Motion to Dismiss.

[2] Def.'s Opening Br. 5.

2

party Kahuku Wind Power, a Delaware limited liability company and the owner and operator of the Wind Farm.

In 2011, FW Holdings and Makani executed amendments to the Original LLC Agreement (the "Amended LLC Agreement"), the provisions of which are at issue in this dispute. The Amended LLC Agreement transferred FW Holdings' 92% ownership interest and role as managing member to Plaintiff First Wind Kahuku Holdings, LLC ("First Wind") and Makani's 8% ownership interest to Defendant MNA Kahuku, LLC ("MNA").[3] Further, key to the renegotiation, the Amended LLC Agreement included provisions that granted MNA the right to provide input in the annual budgeting process and curbed First Wind's discretion in issuing distributions of cash; Section 4.4(a) states: "Following the end of each calendar year of the Company, . . . the Company shall distribute the Net Cash of the Company, if any, to the Members."[4] The Amended LLC Agreement defines "Net Cash" as:

> net cash from operating activities . . . prepared in accordance with
> [GAAP] . . . but which shall in any event deduct, to the extent not
> already deducted, (A) debt service . . . , (B) actual expenses, (C) taxes
> and (D) any amount determined by the Managing Member as
> necessary to meet the requirement of any third party financing
> agreements and for reasonable reserves for contingencies and
> expected expenses.[5]

---

[3] *Id.* at 7.
[4] Compl. ¶ 17.
[5] *Id.* ¶ 18.

The parties also negotiated and adopted an extensive arbitration provision in the Amended LLC Agreement, which reads in relevant part:

> All disputes, claims, or controversies arising out of or relating to the corporate contract . . . between and among the Company, its Members, officers, managers, employees or agents (a "Dispute") shall be resolved by mutual agreement of the Members. If a dispute is not resolved by mutual agreement between the Members within thirty (30) days after the start of the Dispute, a Member may deliver written demand to the Company and the other Members and the Dispute shall be resolved solely and exclusively by binding arbitration to be conducted before Dispute Prevention Resolution, Inc. ("DPR") or its successor; provided, that, for purposes of clarification, this arbitration clause does not apply to (a) Member votes or decisions (such as with respect to the Annual budget or Super Majority Vote under SubArticle 7.3 of this Agreement) of the Managing member . . . . The parties will initiate and select a single arbitrator in accordance with DPR's prevailing rules and procedures. Any such arbitration shall be held on the island of Maui, State of Hawaii and shall be conducted in accordance with DPR rules and regulations unless specifically modified herein. . . . The provisions of this SubArticle shall be enforceable In [sic] any court of competent jurisdiction. Each of the parties hereto irrevocably and unconditionally consents to the exclusive jurisdiction of the arbitrator to resolve all disputes, claims or controversies arising out of or relating to (i) this Agreement . . . and further consents to the jurisdiction of the courts of the State of Hawaii for the purposes of enforcing the arbitration provisions of this SubArticle.[6]

Around the same time that the Amended LLC Agreement was adopted, in April 2011, the Wind Farm became operational. Development and construction of the Wind Farm had required "significant" up-front costs.[7] To cover these expenses, Kahuku Wind Power entered into a loan agreement for $117,330,968

---

[6] Am. LLC Agreement § 11.13.
[7] Compl. ¶ 24.

4

(the "DOE Loan Agreement") with the United States Department of Energy (the "DOE") in July 2010, as well as received capital contributions from First Wind.[8] MNA only contributed "an initial nominal contribution of $80."[9] Soon after the project launched, however, the energy storage facilities "suffered two small fires and then a catastrophic fire on or about August 1, 2012," causing the Wind Farm to become completely inoperative from August 1, 2012 to August 29, 2013.[10] The Wind Farm was able to return to production in September 2013, but could only operate on a "significantly reduced capacity"—"approximately sixteen percent of its prior capacity"—through January 2014.[11] Currently, the Wind Farm is back to "operating at full capacity, but its contract to supply power is still pending approval by the Hawaii Public Utilities Commission."[12]

Despite the Wind Farm's fires and resulting diminished production capacity, "in late 2013, MNA began demanding that [Kahuku Holdings] make distributions to its members" pursuant to the Net Cash provision of the Amended LLC Agreement.[13] On December 30, 2013, MNA made a written demand on Kahuku Holdings for $1,059,550, "which MNA claimed represented its share of Net Cash

---

[8] *Id.* ¶ 71.
[9] *Id.* ¶ 24.
[10] *Id.* ¶¶ 25–26.
[11] *Id.* ¶¶ 26, 72.
[12] *Id.* ¶ 26.
[13] *Id.* ¶ 72.

of the Company for 2012."[14]  In a written response, First Wind denied the demand, notifying MNA that the loss of operations due to fire had triggered a provision of the DOE Loan Agreement that prevented Kahuku Wind Power from issuing a distribution.  Specifically, Kahuku Holdings cited § 7.10(a) of the DOE Loan Agreement, which prevents Kahuku Wind Power from "reduc[ing] its capital or declar[ing] or mak[ing] or authoriz[ing] any dividend or any other payment or distribution of cash or property to its Equity Owners on account of any equity interest" so long as certain enumerated conditions are not met, including that "no Potential Default or Event of Default exists."[15]  According to the Plaintiffs, the DOE, which "controls access to [Kahuku Wind Power's] accounts" pursuant to the DOE Loan Agreement, had taken the position that, in addition to other missing conditions under Section 7.10(a), the halted and eventual diminished operations of the Wind Farm due to fire constituted a Potential Default or Event of Default, and thus the DOE would "permit[] funds to be withdrawn only for limited rebuilding purposes."[16]  As a result, First Wind informed MNA that "after deducting all of the amounts determined by First Wind, in its discretion as Managing Member, to be 'necessary to meet the requirements of third party financing and for reasonable

---

[14] *Id.* ¶ 74.

[15] *Id.* ¶¶ 76–77.  In the DOE Loan Agreement, Kahuku Holdings is the "Equity Owner" of Kahuku Wind Power. *Id.* ¶ 76.

[16] *Id.* ¶ 78.

reserves for contingencies and expected expenses,' from the amount shown as 'net cash from operating activities,' Net Cash equaled zero in 2012."[17]

Following the initial distribution demand in late 2013, MNA and First Wind traded correspondence in early 2014 in which MNA demanded to see the DOE Loan Agreement, which First Wind provided, and reiterated its demand for a distribution of Net Cash, which First Wind repeatedly denied. In letters in March and May of 2014, MNA "notified First Wind that there was a 'Dispute' between MNA and the Company and threatened arbitration."[18] On June 4, 2014, MNA "demanded to inspect voluminous books and records of the Company," including "the General ledger, trial balance, Cash receipts journal, Cash disbursement journals, Payroll registers, General journal entries, Invoices from vendors, Bank statements, Loan agreements and related documents [and] Agreements between [Kahuku Holdings] and related parties or affiliates" "from the inception of the Company to present."[19] In response, First Wind notified MNA that certain books and records would be made available at its principal place of business in August 2014, but that others would first need to be identified and collected from off-site locations. Subsequently, on July 14, 2014, MNA filed an arbitration demand with DPR in Hawaii asserting four counts: that First Wind's failure to distribute Net

---

[17] *Id.* ¶ 83.
[18] *Id.* ¶ 86.
[19] *Id.* ¶¶ 42–44.

Cash after calendar years 2012 and 2013 constituted (1) a breach of the Amended LLC Agreement, (2) a breach of the implied covenant of good faith and fair dealing, and (3) a breach of First Wind's fiduciary duties as a majority member of Kahuku Holdings; and (4) that First Wind had wrongfully denied MNA's right to inspect books and records of Kahuku Holdings.

In response to MNA's arbitration demand, Plaintiffs have filed suit in this Court seeking declaratory and injunctive relief, and have brought a Motion for a Preliminary Injunction to prevent MNA from proceeding with the Hawaii arbitration. MNA has responded by filing to dismiss the action for lack of personal jurisdiction and insufficiency of process and service of process. In addition, MNA argues that this Court should dismiss this litigation in favor a pending action in the Second Circuit Court of the State of Hawaii, in Maui, where MNA filed a motion to compel arbitration after the initiation of this litigation. MNA did not address insufficiency of process and service of process at oral argument, and I do not consider them here. The remainder of this Letter Opinion addresses the remainder of MNA's Motion to Dismiss and Plaintiffs' Motion for a Preliminary Injunction.

II.  *The Parties Agreed to Litigate Arbitrability in Hawaii*

The advantage of the Delaware LLC form is flexibility. With the exception of a few rules, and default provisions easily contracted around, the parties are free to structure their relationship as they see fit. Consistent with Delaware's

8

contractarian approach to the LLC, this Court respects choices of law and venue in LLC agreements, to the extent consistent with statute. The parties here chose Delaware law to cover disputes arising under the agreement.[20] They employed a broadly written arbitration provision, directing that "[a]ll disputes, claims, or controversies arising out of or relating to" the Amended LLC Agreement, not subject to resolution by the parties during a thirty-day negotiation period, "shall be resolved solely and exclusively by binding arbitration to be conducted before Dispute Prevention Resolution, Inc. ("DPR")." The parties agreed to arbitrate in accordance with DPR rules and regulations, and provided specifically for the venue of the arbitration: "Any such arbitration shall be held on the island of Maui, State of Hawaii . . . ."

This broadly written provision was subject to exceptions. Pertinent here is the provision that "this arbitration clause does not apply to . . . Member votes or decisions . . . of the Managing Member." The arbitrability issue here concerns whether the current dispute over net cash is within this carve-out.

The parties agree that arbitration is specifically governed by the DPR rules and that those rules provide that a determination of arbitrability is a matter to be decided by a court of competent jurisdiction, and not the arbitrator.[21] As our

---

[20] Am. LLC Agreement § 11.5.
[21] *See* Arbitration Rules, Procedures & Protocols of Dispute Prevention & Resolution, Inc. § IV.5 ("Issues of arbitrability such as whether a valid agreement to arbitrate exists, whether a contract

9

Supreme Court found in *Willie Gary*, where the parties have adopted an arbitration procedure covered by a comprehensive body of rules, those rules form a part of the contract between the parties, and will be enforced.[22] Under that rationale, MNA argues that the adoption of the DPR rules represents a choice of venue in Hawaii, because those rules expressly adopt Hawaii statutes that direct that arbitrability be determined by a court in that state. MNA points out that the DPR rules provide in the introductory passage that "these rules are to be interpreted and applied pursuant to and in conjunction with **Hawaii Revised Statute Section 658A**,"[23] the Hawaii version of the Revised Uniform Arbitration Act (the "RUAA"). Further, the DPR rules provide that arbitrability "shall be handled pursuant to RUAA Section 6."[24] That statutory provision, codified at *Haw. Rev. Stat.* § 658A-6, provides that arbitrability is to be determined by "The court," a term defined in the Hawaii Code as "any district or circuit court of competent jurisdiction in the State [of Hawaii]."[25] In other words, the DPR rules provide that matters of arbitrability are

---

containing a valid agreement to arbitrate is enforceable, and other related issues shall be handled pursuant to the RUAA, Section 6."). Section 6 of the RUAA—Hawaii's Revised Uniform Arbitration Act—states, "The court shall decide whether an agreement to arbitrate exists or a controversy is subject to an agreement to arbitrate." *Haw. Rev. Stat.* § 658A-6(b).

[22] *See James & Jackson, LLC v. Willie Gary, LLC*, 906 A.2d 76, 80 (Del. 2006) ("As a matter of policy, we adopt the majority federal view that reference to the AAA rules evidences a clear and unmistakable intent to submit arbitrability issues to an arbitrator.").

[23] Arbitration Rules, Procedures & Protocols of Dispute Prevention & Resolution, Inc., Introduction (emphasis in original).

[24] *Id.* § IV.5.

[25] *Haw. Rev. Stat.* § 658A-6; *id.* § 658A-1.

to be determined in the courts of Hawaii, where such an action is currently pending.

Plaintiffs suggest that reference to the Hawaii Code under the DPR rules is merely an artifact of the choice of arbitration venue in Hawaii, and is too attenuated to be relied on under the rationale of *Willie Gary* as forming a part of the agreement between the parties. I need not resolve that issue, because the parties further made their consent to Hawaii venue explicit. Section 11.13 of the Amended LLC Agreement provides, "Each of the parties hereto irrevocably and unconditionally consents to the exclusive jurisdiction of the arbitrator to resolve all disputes . . . and further consents to the jurisdiction of the courts of the State of Hawaii for the purposes of enforcing the arbitration provisions of this [section]." This language confirms the provision that a Hawaii court shall determine arbitrability under the DPR rules incorporated into the contract by the parties.

Plaintiffs point out, correctly, that in the language cited above, First Wind has only "consented" to jurisdiction, not bound itself to *exclusive* jurisdiction, to litigate arbitrability in Hawaii. They suggest that this is insufficient to cause me to defer to the Hawaii court, pointing to decisions of this Court requiring "express language clearly indicating the forum selection clause excludes all other courts."[26] If this provision were to be interpreted apart from the other language of the

---

[26] *Eisenbud v. Omnitech Corp. Solutions, Inc.*, 1996 WL 162245, at *1 (Del. Ch. Mar. 21, 1996).

Amended LLC Agreement, the Plaintiffs' interpretation may prevail. But under our rules of construction, I must read the contract as a whole.[27] This agreement involves an LLC with two members—First Wind, the manager with 92% of the ownership and 100% of the voting rights, and MNA, owner of the remaining 8% with no voting control over the LLC. MNA is a minority owner of this Delaware LLC but has no other connections with Delaware. It is unquestionably subject to jurisdiction in Hawaii. First Wind is the sole managing member of the Delaware LLC, is itself a Delaware LLC, and is subject to Delaware jurisdiction. It is headquartered in Boston, not a nearby locale as we on the East Coast reckon distance, but cheek-by-jowl to Delaware in comparison to Hawaii. In other words, it is clear that the parties' consent to resolution by the Hawaii courts on issues of arbitrability was a contractual provision for the benefit of MNA, a Hawaii citizen which made a small minority investment in ownership of a Hawaiian wind farm, to insure that arbitral disputes—including questions of arbitrability—could be decided close to home, not 5000 miles away in a Delaware courtroom. If I read "consent" as merely an agreement not to contest jurisdiction in Hawaii on constitutional grounds, rather than as consenting to Hawaii as a forum, the provision is effectively meaningless. A Hawaiian venue for arbitrability could be

---

[27] *E.g.*, *Osborn ex rel. Osborn v. Kemp*, 991 A.2d 1153, 1159 (Del. 2010) ("We will read a contract as a whole and we will give each provision and term effect, so as not to render any part of the contract mere surplusage.").

12

defeated simply by First Wind doing what it has done here: responding to an arbitration demand with a suit for injunctive relief in a court outside of Hawaii. That cannot have been the intention of these parties. Reading § 11.13 in its entirety, it is clear that the parties have adopted Hawaii as the exclusive venue for arbitration, adopted a comprehensive set of arbitration rules incorporating Hawaiian law that provides for venue in a court in that state, and confirmed that choice with language by which First Wind has consented to the jurisdiction of the courts of Hawaii for consideration of the precise question presented here—arbitrability of a particular dispute.[28]

Therefore, because I find that the arbitration provision in the Amended LLC Agreement represents an agreement that both arbitration and arbitrability shall be undertaken in the courts of Hawaii, this matter must be dismissed or stayed in favor of MNA's action currently pending in a court in that state.[29]

III. *Personal Jurisdiction*

Because I have found that the parties' arbitration provision divests this Court of subject matter jurisdiction over resolving issues of arbitrability, I need not make

---

[28] Such a determination by the Hawaii court will involve no important questions of Delaware policy or the internal affairs of a Delaware entity; the Hawaii court will simply be called upon to apply the Delaware objective rule of contract interpretation—call them like they are written—to the language the parties have chosen in the Amended LLC Agreement.

[29] I note that Plaintiffs failed to advance at oral argument a contention raised initially in briefing that the parties' choice of Hawaii as a forum, if exclusive, would be invalid under 6 *Del. C.* §18-109(d). The prohibition in that section is not at issue here, as it only applies to protect a *non-manager's* right to maintain a legal action or proceeding in the courts of Delaware, and First Wind is admittedly a manager of this LLC.

a determination on whether MNA is subject to personal jurisdiction at this time. However, for the sake of completeness, I note that, even requiring only a *prima facie* showing of personal jurisdiction and construing the record in the light most favorable to the Plaintiffs, as I would have to do at the motion-to-dismiss stage,[30] Plaintiffs would have a stiff grade to climb to make such a showing here.

The personal jurisdiction analysis has two prongs—first, whether this Court has statutory authority to exercise jurisdiction over the nonresident defendant, and second, whether the exercise of jurisdiction over the nonresident defendant complies with Due Process Clause of the Fourteenth Amendment.[31] Plaintiffs posit that this Court has proper statutory jurisdiction over MNA under both 6 *Del. C.* § 18-109(a) and 10 *Del. C.* § 3104(c)(1). Section 18-109(a), also known as the LLC Act's implied consent statute, does not apply, however, as MNA is neither a named nor de facto manager of Kahuku Holdings.[32] Thus, statutory authority for personal jurisdiction, if it exists, must be found in § 3104(c)(1), the transacting-business arm of Delaware's Long Arm Statute. Previous decisions of this Court, however, cast

---

[30] *E.g.*, *Ryan v. Gifford*, 935 A.2d 258, 265 (Del. Ch. 2007).

[31] *E.g.*, *AeroGlobal Capital Mgmt., LLC v. Cirrus Indus., Inc.*, 871 A.2d 428, 438 (Del. 2005).

[32] Plaintiffs' argument that MNA is a de facto manager because the Amended LLC Agreement grants it a right to give feedback on Kahuku Holdings' annual budgeting is unavailing, as this Court has made clear that merely the ability to be heard in managerial decisions does not rise to the level of managerial power. *See Fisk Ventures, LLC v. Segal*, 2008 WL 1961156, at *7 (Del. Ch. May 7, 2008) ("There is a difference between material participation in managing a company and offering comments via email to one's appointed Board representatives. The latter is simply insufficient to permit this Court to rule that [defendant] consented to personal jurisdiction in Delaware.").

doubt that MNA's role as a joint venturer with a small, minority interest in a Delaware LLC would constitute transacting business under § 3104(c)(1).[33]

Even if MNA's actions satisfy the Long Arm Statute, I would have difficulty finding that the exercise of personal jurisdiction under these circumstances complies with the Due Process Clause of the Fourteenth Amendment—*i.e.*, that MNA "engaged in sufficient 'minimum contacts' with Delaware" such that requiring MNA litigate arbitrability in this Court is "consistent with the traditional notions of fair play and justice."[34]  Minimum contacts are contacts with Delaware such that MNA "should reasonably anticipate being haled into court there."[35]  Even if minimum contacts are present, our jurisprudence would additionally require me to engage in a separate and subsequent inquiry to determine whether exercising jurisdiction over MNA would be fair and just, by a standard of reasonableness, in light of all circumstances.[36]  While MNA helped co-found a Delaware LLC as well

---

[33] *See EBG Holdings, LLC v. Vredezicht's Gravenhage 109 B.V.*, 2008 WL 4057745, at *6 (Del. Ch. Sept. 2, 2008) (declining to extend long-arm jurisdiction over a nonresident founding member of an LLC where the "only business [plaintiff] claims defendant transacted in Delaware was 'participating in the formation in Delaware of [the LLC]'"); *Fisk Ventures, LLC v. Segal*, 2008 WL 1961156, at *7 (Del. Ch. May 7, 2008) (declining to extend long-arm jurisdiction over an investor in a Delaware LLC who was solely responsible for causing the LLC to be reincorporated in Delaware).

[34] *AeroGlobal Capital Mgmt.*, 871 A.2d at 440.

[35] *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297 (1980).

[36] *See Sternberg v. O'Neil*, 550 A.2d 1105, 1122 (Del. 1988) ("Once it has been decided that a defendant purposefully established minimum contacts with the forum State, these contacts must be considered in light of other factors to determine whether the assertion of personal jurisdiction would comport with fair play and substantial justice.  However, as the United States Supreme Court also noted in [*Burger King Corp. v. Rudzewicz*], the due process clause may not readily be wielded as a territorial shield to avoid interstate obligations that have been voluntarily assumed.

15

as negotiated and executed the Amended LLC Agreement, it did so only as a small, minority member with no voting rights, and further specifically contracted for an arbitration provision that *both* adopted arbitral rules that set disputes over arbitrability in a Hawaiian court *and* expressly named Hawaii as the venue for settling disputes over arbitrability. Under these circumstances, it seems unlikely that MNA should have reasonably foreseen being haled into a Delaware court six time zones to the east to litigate the arbitrability of the parties' current dispute, or that such an exercise of personal jurisdiction would be constitutionally reasonable.

IV. *Conclusion*

Since I find that the parties agreed to litigate arbitrability in Hawaii, the Plaintiffs' Motion for a Preliminary Injunction is DENIED. The parties shall confer and inform me whether it is appropriate that I dismiss this action, or enter a stay pending a ruling on arbitrability from the Second Circuit Court of the State of Hawaii. To the extent the foregoing requires an Order to take effect, IT IS SO ORDERED.

Sincerely,

*/s/ Sam Glasscock III*

Sam Glasscock III

---

When a corporate defendant who has purposefully directed its activities at a forum, seeks to defeat the forum's jurisdiction, it 'must present a compelling case that the presence of some other considerations would render jurisdiction unreasonable.'" (citing *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 477 (1985))).

16